**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**TERRY CONANT,**

        **Plaintiff,**

    v.

**DELAWARE COUNTY BOARD**
**OF COUNTY COMMISSIONERS,**
**et al.,**

        **Defendants.**

**Case No. 2:10-CV-221**
**JUDGE SARGUS**
**MAGISTRATE JUDGE KEMP**

---

**OPINION AND ORDER**

This matter is before the Court for consideration of Defendants' Motion for Summary

Judgment (Doc. 32).  For the reasons set forth herein, Defendants' motion is **GRANTED.**

**I.**

Plaintiff Terry Conant ("Conant") brings the instant action for religious discrimination

against the Delaware County Board of County Commissioners ("Board"), former Commissioners

James Ward ("Ward"), Glenn Evans ("Evans"), and Kris Jordan ("Jordan") in their individual

and official capacities, and former Delaware County employee Kevin Williams ("Williams") in

his official and individual capacities.  Conant, Delaware County's former dog warden, alleges

that Defendants violated Title VII of the Civil Rights Act of 1964, the Ohio antidiscrimination

statute, and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the

United States by taking adverse employment actions against her because of her religious beliefs.

**A.**

Conant served as dog warden from 1986 until November 11, 2008, when her employment

was terminated.  (Conant Aff. ¶ 2.)  Defendants Ward, Evans, and Jordan served on the Board

and made the decision to terminate Conant's employment.  Williams is the former director of administrative services of Delaware County and exercised direct supervision over Conant until leaving the county's employ in January 2007.  (*See* Williams Dep. 9–10.)  At the time of Conant's termination in November 2008, she was supervised by Lisa Iannotta.  (*See* Iannotta Dep. 12.)  Conant was ultimately replaced as dog warden by assistant warden Robert Ferguson.  (*See* Ferguson Dep. 9.)

As dog warden, Conant's responsibilities included, inter alia, the maintenance of county dog-ownership records, seizing and impounding dogs, supervising the assistant dog wardens, investigating claims of damage to animals caused by dogs, and responding to emergency and non-emergency calls concerning dog bites, stray dogs, and vicious or dangerous dogs.  (Conant Aff. ¶ 8.)  Conant's claims arise from two disciplinary actions taken against her by the Board for what Defendants allege were failures to perform her assigned duties and misfeasance.  The first of these disciplinary actions resulted in a 30 day suspension of her employment; the second resulted in her termination.

On August 24, 2006, Evans and Jordan approved Conant's 30 day suspension.  (Jordan Dep. Ex. 2.)  The suspension was based on allegations that Conant:

> 1. Failed to properly respond or dispatch an assistant dog warden to aggressive/dangerous stray dog calls;
>
> 2. Placed residents, law enforcement officers, and the employees of other agencies, in dangerous situations;
>
> 3. Failed to properly respond to a volatile situation in the dog shelter;
>
> 4. Failed to properly file a dog bite report with the Health District or dishonestly stated a dogbite [sic] someone;
>
> 5. Dishonesty with a dog owner regarding the site that his dog was seized;

6. Utilized county equipment, services, and time for personal basis that far exceeds what a reasonable person would consider as limited basis; and

7. Falsified time records and log sheets.

(Jordan Dep. Ex. 2.)  The fifth charge was later withdrawn by the Board. (*See* Doc. 33 at 11.)

Williams testified that an incident occurring on January 18, 2006 wherein Conant failed to respond to calls from sheriff's deputies to assist with the capture of two Rottweilers triggered the investigation that eventually resulted in Conant's suspension. (Doc. 33 at 3.)   Following the investigation, Williams had recommended to the Board that Conant be terminated, but testified that in doing so, he merely concurred with the recommendation of Susan Brown, another county official, whom Williams and David Cannon, the county administrator, had selected to conduct the investigation into Conant's misconduct. (*See* Williams Dep. 57.)  Brown had previously worked as an investigator for the Equal Employment Opportunity Commission ("EEOC") and, at the time in question, served as the director of Delaware County's Child Support Enforcement Agency. (Williams Dep. 38, 44–45.)  According to Williams, he and Cannon decided to select Susan Brown to conduct the investigation because Conant reported directly to Williams. (Williams Dep. 41.)  Williams also asked the assistant dog wardens, including Ferguson, to provide information to him concerning Conant's activities as part of the investigation.  Despite the recommendation of termination, the Board ultimately chose to suspend Conant in part because of the longevity of her service to the county. (Williams Dep. 58.)  In her affidavit submitted in opposition to Defendants' motion for summary judgment, Conant avers that the Board's decision to take harsh disciplinary action was based solely on Williams' investigation and Williams' recommendation. (Conant Aff. ¶ 25.)  However, Conant's affidavit fails to address the report prepared by Susan Brown.

Conant appealed the Board's decision to suspend her to the Ohio State Personnel Board of Review ("SPBR"), which upheld the decision. (*See* Doc. 33.) In the course of Conant's appeal, Administrative Law Judge James Sprague made the following findings of fact in his report and recommendation to the SPBR:

> [Conant] repeatedly and extensively violating [sic] the county's policy regarding the use of the county's computer and email system. [Conant]'s assertion that the emails only took a few minutes to compose because she had already written down what she wanted to say in the emails and only needed to type them is belied by the length and formatting of the emails.
>
> It is highly unlikely that even a skilled typist would be able to produce these emails in as short a time as [Conant] indicated in her testimony. Additionally, the evidence shows that several of these emails were produced on days in which [Conant] flexed her time to leave work early, as she had not taken a lunch break. Finally, I find that these emails were in support of religious causes, in direct contravention of the prohibition listed in Item 4, Page 14, of the Delaware County Employee Handbook, a prohibition known and understood by [Conant].
>
> I further find that [Conant] failed to respond to at least three calls requiring her presence.
>
> First, [Conant] did not respond to repeated requests for assistance from Delaware County Sheriff's Deputies David Johnson and Anthony Banfield on January 18, 2006, even though [Conant] was the on-call employee that night for her office.
>
> Secondly, [Conant] did not respond to repeated requests for her presence from Assistant Dog Warden Bob Ferguson on January 25, 2006.
>
> Thirdly, [Conant] did not respond to the call on January 19, 2006 involving two dogs chasing horses, and instead merely left a message at the dog shelter for an assistant dog warden to attempt to capture of [sic] the dogs the following morning. Though these events were ultimately resolved, [Conant]'s actions were at a minimum insufficient and were at worst neglectful of her duty; regardless, [Conant]'s actions do not comport with those that might be expected from a county department head.
>
> Finally, I find that the testimony presented and evidence admitted provide support for [the Board]'s allegation that [Conant]'s management of the dog shelter and assistant dog wardens was inefficient, neglectful of [Conant]'s statutory and county duties, and in violation of a number of well-known and well-understood county policies.

4

(Doc. 33 at 11–12.)

Conant contends that she adequately responded to the situation involving the Rottweilers by contacting Brandon Clark, an agent of the Humane Society. (Conant Aff. ¶ 24.) She further claims that no written policy existed governing how after-hours emergency calls should be handled. (Conant Aff. ¶ 27.) She has not produced evidence tending to dispute the other articulated bases for her suspension.

Conant's employment with Delaware County was terminated in November 2008, more than two years after her suspension. The Board terminated Conant's employment for the following stated reasons:

> 1. Failing to properly respond to an aggressive/dangerous dog on September 9, 2008 after 911 dispatchers received a call stating an aggressive dog had bitten a child and the mother had requested that the aggressive dog be removed from the residence. When Ms. Conant failed to property respond, the Director of Administrative Services contacted an Assistant Dog Warden who handled the situation, going to the residence and removing the dog. Furthermore, Ms. Conant provided untruthful statements and inconsistent explanations regarding the details of the incident;

> 2. Potentially placing residents, citizens, and emergency paramedics or others in a potentially dangerous situation by failing to properly respond to the 911 call regarding the aggressive dog;

> 3. Violating the hours of work and overtime policy by failing to receive prior approval from your Director to work additional hours on September 10, 2008 after having been specifically instructed previously that overtime hours must be pre-approved (with the exception of "page-out" situations);

> 4. Failing to properly notify your Director that there was a serious case of parvovirus in the Delaware County Dog Shelter resulting in the death of several dogs. While a notation in a memo was received, the seriousness of the situation was not recognized by the Dog Warden.

> 5. Failure to professionally provide services to the public including citizens and employees of the Delaware County Humane Society. Ms. Conant's action failed to provide professional services as well as exercise good judgment when she took a dog to the Humane Society for adoption outside of the agreed upon timeframe. When the staff authorized to accept and pay for the dog were not available Ms.

> Conant left the dog at the Humane Society anyway instead of returning the dog to the Dog Shelter. Ms. Conant then proceeded to accept money for the dog from a private citizen.

(Cannon Dep. Ex. 4 at 2.)

The primary incident giving rise to Conant's termination occurred on September 9, 2008. While on duty, Conant received a call from the 911 dispatcher regarding a dog bite. However, rather than traveling immediately to the home where the bite had occurred, she called the home and left a voice message. (*See* Doc. 33-1 at 7.) In the meantime, Cannon called Iannotta, informed her that Conant had not responded to the call, and instructed her to get in touch with Conant about handling the situation. (Doc. 33-1 at 5.) Iannotta subsequently was unable to reach Conant, and instead contacted Assistant Warden John King, who then went to the home and secured the dog. (*See* Doc. 33-1 at 5.) Conant contends that she followed established procedures in handling the situation. Specifically, she claims that an in-person response to the dog bite was not required because a sheriff's deputy was present at the scene, the dog-owner was known, the dog was contained safely in the home, and the victim had already been transported to the hospital. (Conant Aff. ¶ 31.) However, according to Iannotta, a meeting between Conant, Iannotta, Cannon, a representative from the Sherriff's Office, and a representative from the 911 call center was held in August 2008 to discuss responses to dog bite calls. (Doc. 33-1 at 5.) At this meeting, Conant was informed that 911 bite calls were to be responded to by the dog warden on call. (Doc. 33-1 at 5.) Iannotta acknowledged that in-person responses to such calls were not necessarily required, but stated that because the September 9, 2008 incident concerned a possibly vicious dog, and the details of what had occurred were not clear, Conant should have personally gone to the home to resolve the situation. (Doc. 33-1 at 5.)

6

As with her suspension, Conant appealed her termination to the SPBR.  Following a hearing, administrative Law Judge Jeannette Gunn found that discipline of Conant for the incident involving the parvovirus and the incident involving the Humane Society was not warranted because the Board had failed to demonstrate that established standards of conduct were violated by Conant with regard to these incidents.  (Doc. 33-1 at 13.)  Nonetheless, Judge Gunn recommended that the SPBR affirm Conant's termination.  The SPBR did so by Order dated December 15, 2009.  (Doc. 33-1 at 15.)  Conant subsequently appealed that decision to the Delaware County Court of Common Pleas, which affirmed the termination on May 3, 2011.  (*See* Doc. 66-1.)

**B.**

Conant is an evangelical Christian and claims that her suspension and termination were the result of discrimination based on her religious beliefs.  In her affidavit she states the following concerning those beliefs:

> I am required to give witness to Christ through my behavior in my daily life; I attend non-sectarian services and houses of worship which follow or participate in the Charismatic doctrine and faith practice, and pray publicly, attempting to live out my religious beliefs and convictions my [sic] daily life, with my belief system constituting a determining factor in my behavior towards others, including co-workers.

(Conant Aff. ¶ 10.)  She further avers that she frequently wears a cross outside of her clothes and expresses her faith on a daily basis.  (Conant Aff. ¶ 11–12.)

As evidence that she was subjected to discrimination based on her religious beliefs, Conant points to several facts, most involving Williams and Ferguson.  According to her, Ferguson, who happens to be an ordained minister in the Pentecostal faith, (Ferguson Dep. 24), was often critical of her religious beliefs.  For instance, Daryl Evans, an assistant dog warden, testified at his deposition that fellow assistants King and Ferguson would make fun of Conant's

7

beliefs when she was not present. (D. Evans Dep. 102.) Evans also testified that Ferguson was always in communication with supervisors trying get Conant disciplined. (*See* D. Evans Dep. 112.) According to Evans, Ferguson urged him to keep bringing Ferguson information on Conant's activities. (D. Evans Dep. 117.) Evans implied that Ferguson's intention was to have Conant removed so that Ferguson could become dog warden. (*See* D. Evans Dep. 113–14.) However, Evans testimony is somewhat contradictory on this point, as, later in his deposition, he indicated that Ferguson frequently stated that King was to become dog warden after Conant was removed. (D. Evans Dep. 118.)

Conant further claims that Ferguson's deposition testimony indicates that he harbored hostility to her form of worship. Ferguson testified that he preferred "the older versus the more charismatic" style of worship. (Ferguson Dep. 71–72.) However, Ferguson's testimony also indicates that he and Conant's religious beliefs were very similar. For instance, he stated that they both attended the same outdoor tent revival meeting on one occasion. (Ferguson Dep. 66–68.) On the other hand, Ferguson admitted to referring to Conant as "the apostle" in what he claims was a tongue-in-cheek manner in documentation that was provided to Williams as part of the investigation that led to her suspension. (Ferguson Dep. 186.)

With regard to Williams, Conant avers that she was chastised by him in June 2004 because she expressed religious beliefs in a personality profile piece in the magazine of the National Animal Control Association. (Conan Dep. ¶ 18.) Conant further avers that she was also reprimanded by Williams in the summer of 2005 for leading a luncheon prayer at a meeting of the Ohio Dog Wardens Association. (Conant Aff. ¶ 19.) Conant also notes the fact that Cannon testified that Williams once mentioned to him the fact that Conant would wear a cross to work. (Cannon Dep. 45.)

8

Conant claims that further evidence of discrimination lies in the fact that Williams used a GPS tracking feature on Conant's county-issued phone to track her whereabouts. According to Williams, he also occasionally used the tracking feature to monitor the whereabouts of other employees, but specifically monitored Conant out of concerns that she was leaving Delaware County and "going places where she wasn't supposed to be." (Williams Dep. 108, 110.) However, he testified that in monitoring her, he did not notice anything unusual. (Williams Dep. 110.) Conant has not produced evidence tending to demonstrate that Williams' reasons for tracking her whereabouts were related to religion.

Conant generally avers that Defendants encouraged her subordinates' interference with her employment, alleging that Ferguson played a decisive role in the events leading to her discipline by working directly with Williams. (*See* Conant Aff. ¶ 23.) As stated above, as part of the investigation leading to Conant's August 2006 suspension, Williams instructed Conant's subordinates to monitor Conant's activities and report to him. (*See* Ferguson Dep. 153–54.) Conant also points to the fact that Cannon admitted Conant's religious beliefs were discussed by county management. In this regard, Cannon testified that Conant's religion came up as a topic of discussion related to disciplinary action against Conant, but also testified that the purpose for discussing her religion was to document that any action was not being taken based on an impermissible factor. (Cannon Dep. 106–07.) Finally, Conant also contends that the fact that Board meetings sometimes included prayer provides evidence of discrimination.

## C.

Conant initially filed suit in the Court of Common Pleas of Delaware County on August 22, 2008, but that action was removed to this Court by Defendants in case number 2:08-cv-902. That action was subsequently dismissed without prejudice pursuant to Rule 41(a) on August 3,

9

2009 on motion by Conant. Conant refiled her claims in this Court as part of the instant action on March 12, 2010. Defendants' now move for summary judgment.

II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see*

10

*Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

### III.

Conant brings claims for violation of § 4112.02 of the Ohio Revised Code, Title VII of the Civil Rights Act of 1964, and pursuant to 42 U.S.C. § 1983, for violations of the Fourteenth Amendment's equal protection clause against the Board, and all of the individual Defendants in both their official and individual capacities. As suits against an individual in his or her official capacity are the equivalent of suits brought against the governmental entity itself, the Court deems all of the official capacity claims to be claims against the Board. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) ("A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity.").

### A.

The Court first addresses several threshold arguments raised by Defendants, as Defendants' success on several of these issues somewhat narrows those remaining. Defendants first contend that Conant's claims are barred by the doctrine of collateral estoppel. Second, they assert that Conant's Title VII claims should be dismissed because she failed to timely exhaust administrative remedies. Third, as to Conant's § 1983 claims against the Board, they argue that Conant has failed to offer evidence from which a reasonable jury could find that a policy of

11

Delaware County was the moving force behind the religious discrimination to which Conant was allegedly subject. Fourth, they contend that Conant's § 1983 claim against the individual Defendants are barred by the doctrine of qualified immunity. Fifth, Defendants argue that the individual Defendants are shielded from Conant's claim under Chapter 4112 of the Ohio Revised Code by statutory immunity. Finally, Defendants assert that Conant's Title VII and § 1983 claims against Williams are barred by the applicable statutes of limitation.

**1.**

Defendants contend that collateral estoppel bars Conant from relitigating the appropriateness of the discipline to which she was subject. As explained below, this argument is without merit. "Collateral estoppel, also called claim preclusion, prevents a party from relitigating issues of fact or law which were necessarily decided by a previous final judgment." *Smith v. Sushka*, 117 F.3d 965, 969 (6th 1997). To determine whether collateral estoppel applies, the Court must look to the law of Ohio, where issues surrounding Conant's suspension and termination have already been litigated before the SPBR. *See id.* In Ohio,

> [t]he main legal thread which runs throughout the determination of the applicability of *res judicata*, inclusive of the adjunct principle of collateral estoppel, is the necessity of a fair opportunity to fully litigate and to be "heard" in the due process sense. Accordingly, an absolute due process prerequisite to the application of collateral estoppel is that the party asserting the preclusion must prove that the identical issue was actually litigated, directly determined, and essential to the judgment in the prior action.

*Goodson v. McDonough Power Equip., Inc.*, 443 N.E.2d 978, 985 (Ohio 1983). Thus, the burden is on Defendants to demonstrate that identical issues raised by the present suit were actually litigated and directly determined by the SPBR. Defendants fail to do so.

Defendants essentially contend that Conant attempts to relitigate the issue of whether the Board subjected her to excessive disciplinary actions even though the SPBR and the Delaware

12

County Court of Common Pleas have already affirmed the penalties to which the Board

subjected Conant. However, this case centers on the issue of whether the stated reasons for the

disciplinary actions were merely a pretext for religious discrimination. As Defendants have not

established that that specific issue was litigated before the SPBR, they have failed to meet their

burden in invoking collateral estoppel.

*Jackson v. Franklin County Animal Control Department*, No. 86AP-930, 1987 WL 18210

(Ohio Ct. App. Oct. 6, 1987), an unpublished case from the Ohio Tenth District Court of

Appeals, presented almost identical factual circumstances as the instant case and is instructive.

In *Jackson*, the plaintiff, an African American man, was discharged from his position as a deputy

dog warden, and simultaneously appealed his discharge to the SPBR and filed charges of race

discrimination with the Ohio Civil Rights Commission ("OCRC"). *Id.* at *1. The SPBR

affirmed his termination, but the OCRC, finding that he had been subjected to discrimination on

account of his race, ordered that he be reinstated to his job. *Id.* The defendant appealed the

OCRC's decision to the Franklin County Court of Common Pleas, which affirmed, and then to

the Court of Appeals. *Id.*

In rejecting the defendant's argument that collateral estoppel barred the OCRC's action,

the Court stated:

> The department's argument misperceives the nature of this race discrimination
> action. Collateral estoppel applies only to those issues necessarily and actually
> litigated in prior proceedings. [ ] The SPBR decided some issues that are relevant
> to this action but did not decide all such issues.
>
> The SPBR investigated only a part of this transaction: whether 'just cause' existed
> for which Jackson could be removed from employment. In race discrimination
> terms, such a finding supplies the employer with a 'legitimate, nondiscriminatory
> reason' for the personnel action it took. However, under the analysis of
> *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, an analysis adopted in
> *Ohio, Plumbers & Steamfitters Commt. v. Ohio Civil Rights Comm.* (1981), 66
> Ohio St. 2d 192, the employer's articulation of a legitimate nondiscriminatory

13

reason does not end the inquiry into discrimination. The use of that reason, as a 'pretext,' can be examined. The SPBR decision does not preclude inquiry into whether the employer's stated reasons for the discharge were pretextual. [ ] Under *McDonnell* and its progeny, discipline must be administered in an evenhanded fashion amongst employees of all races. [ ]

Neither the lower court nor the commission placed any special reliance on the SPBR's factual findings that Jackson had not performed the work assigned to him on September 19, 1983. Both the lower court and the commission, however, relied on pretext, that Jackson would not have been discharged had he been white.

*Jackson*, 1987 WL 18210 at *1–*2 (some citations omitted). A later pronouncement by the

Supreme Court of Ohio lends support to the rationale applied by the Court of Appeals in

*Jackson*. *See City of Whitehall v. Ohio Civil Rights Comm'n*, 656 N.E.2d 684, 687 (Ohio 1995)

("the issues involved in a civil service appeal before either the State Personnel Board of Review

or a municipal civil service commission and an unlawful discriminatory practice charge before

OCRC are different").

Accordingly, as Defendants have failed to demonstrate that issues related to religious

discrimination were actually litigated before the SPBR, the doctrine of collateral estoppel does

not bar Conant's claims.

**2.**

Defendants next argue that Conant's Title VII claim should be dismissed because Conant

has failed to demonstrate that she timely exhausted the administrative remedies available to her

prior to bringing this suit. The Court first notes that claims under Title VII can only be brought

against employers. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000).

Accordingly, dismissal of Conant's Title VII claims as to the individual Defendants is

appropriate.

Pursuant to Title VII, charges of discrimination must be filed with the EEOC within 180

days of alleged illegal discriminatory acts. 42 U.S.C. § 2000e-5(e)(1). An individual must bring

14

suit alleging violations of Title VII within ninety days of receipt of a right-to-sue notice from the EEOC. *See id.* § 2000e-5(f)(1)(A). Action by a prospective plaintiff within these time frames is a prerequisite to the filing of a civil suit. *Puckett v. Tenn. Eastman Co.*, 889 F.2d 1481, 1486 (6th Cir. 1989).

Here, the record contains a charge of discrimination regarding Conant's suspension filed by Conant on August 7, 2007, a right-to-sue notification from the EEOC dated June 12, 2008, a charge of discrimination regarding Conant's termination filed by Conant on April 13, 2009, and a second right-to-sue notification dated December 15, 2009. (Doc. 43.) As noted in Part I.C *supra*, Conant initially filed suit in the Court of Common Pleas of Delaware County on August 22, 2008, but her Complaint did not include a claim brought pursuant to Title VII. That action was subsequently removed to this Court, and, on January 6, 2009, Plaintiff amended her complaint to include claims related to her termination and to add a Title VII claim. (*See* Case No. 2:08-cv-902, Doc. 11.) The original action in this Court was then dismissed without prejudice on Conant's motion pursuant to Rule 41(a). Conant then filed the instant action with identical claims on March 12, 2010.

Based on the above, the Court concludes that Conant is precluded from bringing a Title VII claim arising from her suspension as she both failed to timely file a complaint with the EEOC and failed to timely bring a claim a pursuant to Title VII in this Court. As noted by the EEOC's right-to-sue notification of June 12, 2008, Conant did not timely file the charge of discrimination, as over 300 days had elapsed between her suspension in August of 2006 and the filing of the charge in August 2007. Further, some 200 days elapsed between the time Conant received the notification in June 2008, and the time she amended her initial complaint to include a Title VII claim in January 2009.

The Court, however, also concludes that Conant timely complied with Title VII's administrative remedy requirements to the extent her complaint seeks relief pursuant to Title VII for her termination. In this regard, the Court first notes that less than 180 days passed between Conant's termination in November 2008 and her filing of the second charge of discrimination in April 2009. Further, although she prematurely added a Title VII claim regarding her termination to her initial complaint in January 2009, the instant action was filed within ninety days of the receipt of the second notification from the EEOC in December 2009.

Accordingly, Conant may not seek relief pursuant to Title VII for her August 2006 suspension, but her Title VII claim against the Board arising from her termination is properly before this Court.

**3.**

Turning next to Conant's § 1983 Claim against the Board, Defendants' assert that Conant has failed to produce evidence from which a reasonable jury could find that a policy or custom of the Board caused the alleged deprivation of Conant's constitutional rights. Section 1983 provides in relevant part the following:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. A *prima facie* case under Section 1983 requires (1) conduct by an individual acting under color of state law, and (2) this conduct must deprive the plaintiff of rights secured by the Constitution or laws of the United States. *Day v. Wayne County Bd. of Auditors*, 749 F.2d 1199, 1202 (6th Cir. 1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). Section 1983 merely provides a vehicle for enforcing individual rights found elsewhere and does not itself

16

establish any substantive rights. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002); *Flint v. Kentucky Dep't of Corr.*, 270 F.3d 340 (6th Cir. 2001).

While government entities may be liable for constitutional violations under Section 1983, such liability cannot arise under a theory of respondeat superior merely because constitutional injuries have been inflicted by their employees or agents. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). Rather, "it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under [Section] 1983." *Id.* In other words, there must be a "*deliberate* action attributable to the [governmental entity] [that] directly caused a deprivation of federal rights. *Board of County Comm'rs v. Brown*, 520 U.S. 397, 415 (1997) (emphasis in original). While Defendants argue that no policy existed, as the Court ultimately determines that Conant has failed to produce evidence from which a reasonable jury could find that her constitutional rights were violated—a prerequisite to municipal liability—it does not address whether Conant has established the existence of a discriminatory policy.

**4.**

Defendants next assert that the individual Defendants are shielded from Conant's § 1983 claim by qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a two-part inquiry to determine whether a government official is entitled to qualified immunity. First, a court should determine whether the official's conduct violated a constitutional right. *Id.* at 201. Second, if a constitutional right was in fact

17

violated, the court must determine if the right has been clearly established. *Id.*[1] The official is entitled to qualified immunity if no right has been violated or if the right itself is not clearly established.

Defendants' assertion of qualified immunity relies on the first prong of the above analysis—they argue that no constitutional violation has occurred. As explained in Part III.B.3 *infra*, Conant's claims for religious discrimination fail because she has not produced sufficient evidence of pretext. Accordingly, as Conant has failed to establish that a constitutional violation occurred, the individual Defendants are also entitled to dismissal of Conant's § 1983 claim under the doctrine of qualified immunity.

**5.**

Defendants also argue that the individual Defendants are shielded from liability under the Ohio antidiscrimination statute by § 2744.03 of the Ohio Revised Code. Pursuant to that section, employees of political subdivisions are generally

> immune from liability unless one of the following applies:
>
> > (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
> >
> > (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
> >
> > (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

---

[1] The Supreme Court later held that the *Saucier* "procedure," i.e., that a court sequentially determine whether constitutional injury has occurred and then determine whether the right was clearly established, need not be viewed as an inflexible requirement. *Pearson v. Callahan*, 555 U.S. 223, 227 (2009).

OHIO REV. CODE § 2744.03(A)(6). "Political subdivisions" include counties, and the term

"employee" includes the elected or appointed officials of political subdivisions. *Id.* §

2744.01(B), (F).

Defendants assert that none of the exceptions to statutory immunity are present in this

case. However, this argument is not well taken. Pursuant to § 4112.02 of the Ohio Revised

Code, it is an unlawful discriminatory practice:

> [f]or any employer, because of the race, color, religion, sex, military status,
> national origin, disability, age, or ancestry of any person, to discharge without just
> cause, to refuse to hire, or otherwise to discriminate against that person with
> respect to hire, tenure, terms, conditions, or privileges of employment, or any
> matter directly or indirectly related to employment.

*Id.* § 4112.02(A). As the term "employer" is defined within Chapter 4112 of the code to include

"any person acting directly or indirectly in the interest of an employer," id. § 4112.01(A)(2), the

Supreme Court of Ohio has held that supervisors and managers may be subjected to personal

liability under § 4112.02(A) for their discriminatory acts. *Genaro v. Cent. Transp., Inc.*, 703

N.E.2d 782, 787 (Ohio 1999). Finally, other courts, including this Court, have relied on *Genaro*

in holding that § 4112.02 falls within the third exception to the general grant of statutory

immunity to the employees of political subdivisions as a section of the revised code that

expressly imposes civil liability on such employees. *See Satterfield v. Karnes*, 736 F. Supp. 2d

1138, 1151–54 (S.D. Ohio 2010); *Conroy v. Williams*, 923 N.E.2d 191, 197 (Ohio Ct. App.

2009) ("because R.C. Chapter 4112 has been interpreted to include supervisory and managerial

employees in the statutory definition of "employer," we find that the general immunity provided

in R.C. 2744.02(A) does not apply to McKelvey, because civil liability is imposed by R.C.

4112.02(A) for discriminatory hiring practices"). Accordingly, as the potential for civil liability

is imposed on the individual Defendants by Chapter 4112, statutory immunity is inapplicable to them.

6.

Finally, Defendants assert that Conant's Title VII and § 1983 claims against Williams are barred by the applicable statutes of limitation. It is undisputed that Williams left the employ of Delaware County in January 2007, nearly two years before Conant's employment was terminated in November 2008. (*See* Williams Dep. 9–10.) Further, Conant has produced no evidence that Williams was in any way involved with the decision to terminate her employment. The Court has already dismissed the Title VII claim against Williams in Part III.A.2 *supra*. Further, as noted by Defendants, the limitations period applicable to a § 1983 claim is two years. *See Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003). As the latest point in time a possible § 1983 claim against Williams could have arisen was in January 2007, and this action was not filed until March 2010, Conant's § 1983 claim against Williams is barred by the statute of limitations.

B.

Conant's remaining causes of action consist of claims for religious discrimination arising from her suspension and termination brought pursuant to § 4112.02 of the Ohio Revised Code against all Defendants; claims for violations of Title VII arising from her termination against the Board; and claims for violation of the Fourteenth Amendment arising from her suspension and termination brought pursuant to § 1983 against all Defendants except Williams.

Title VII provides that it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race,

20

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "When using circumstantial evidence to create an inference of discrimination, the complainant must carry the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination by his or her employer." *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). If a plaintiff can successfully establish a prima facie case, a fact finder is then to proceed with the familiar burden-shifting analysis announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this analysis, if a plaintiff establishes his or her prima facie case, the plaintiff "receives the benefit of a presumption that the employer unlawfully discriminated against him." *DiCarlo*, 358 F.3d at 414 (citing *Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). The burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the employment action in question. *McDonnell Douglas*, 411 U.S. at 802. Finally, "should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. The ultimate burden of establishing that discrimination occurred remains with the plaintiff throughout the analysis. *Id.*

Equal protection claims brought pursuant to § 1983 are analyzed under the same standards as discrimination claims brought pursuant to Title VII. *See Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004). Likewise, these same evidentiary standards are used in the analysis of discrimination claims brought pursuant to § 4112.02 of the Ohio Revised Code. *See Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 575 N.E.2d 1164, 1167 (Ohio 1991). Accordingly, the Court will evaluate Conant's remaining claims simultaneously under the Title VII framework discussed above.

**1.**

A plaintiff may establish a prima facie case of discrimination by proving the following four elements:

> (1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees.

*DiCarlo*, 358 F.3d at 415. A Plaintiff's burden in making out its prima facie case of retaliation "is not onerous" and is "easily met." *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (citations omitted). While it is obvious that Conant suffered adverse employment actions when she was suspended and later terminated and that Conant is a member of a protected class based on her religious beliefs, Defendants argue that Conant is unable to establish the remaining two prongs of the prima facie case. Specifically, they assert that because the SPBR affirmed Conant's termination, she was not qualified for the job as dog warden. They further contend that Conant was not replaced by someone outside her protected class because Fergusson himself is also a Christian, with similar beliefs as Conant. Neither of these arguments is well taken.

First, Defendants' contention that Conant was not qualified for the position misconceives the nature of Conant's claims and is not supported by logic. Despite the fact that the SPBR subsequently affirmed the disciplinary actions against her, the essence of Conant's claim of religious discrimination is that she was disciplined not for the proffered reasons, but because of her religious faith. Accordingly, the question of whether she was qualified for the position must be considered at the point in time at which she was terminated, and the fact that her termination was subsequently affirmed by the SPBR, which did not consider the issue of religious discrimination, is irrelevant.

22

Second, the Court also concludes that Conant has met her burden in establishing that she was replaced by someone outside of her protected class. While Ferguson and Conant are both Christians, there are literally hundreds of denominations, sects, and groups within the Christian fold, each practicing unique variations of the overarching Christian faith. As evidenced by past religious strife, not all groups of Christians coexist in harmony with each other. Without wading too deeply into the technical differences between the beliefs of Conant and Ferguson, the record, when construed in favor of Conant, reveals that there were differences in their preferred means of worship. As stated above, Conant's burden in establishing a prima facie case of discrimination is not onerous. Further, at least one circuit has recognized that the prima facie case can be established even in situations wherein all parties are Christians. *See Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365 (7th Cir. 2009).

### 2.

Having concluded that Conant has established a prima facie case of discrimination based on religion, the Court also holds that Defendants have proffered legitimate, nondiscriminatory reasons for the disciplinary actions taken against Conant. As described in detail in Part I.A *supra*, the Board suspended and ultimately terminated Conant for myriad of reasons, including failing to respond to emergency calls, falsifying records, using official time for her personal business, and violating the county's overtime policies. All of these reasons are facially unrelated to Conant's religious beliefs.

### 3.

The Court must next consider whether Conant has produced evidence from which a reasonable jury could find that the stated reasons for the disciplinary action taken against her

23

were merely a pretext for discrimination. Concluding that Conant has failed to do so, the Court grants summary judgment in favor of Defendants.

A plaintiff may establish that a defendant's proffered legitimate reason for taking the employment action is a pretext for discrimination by proving that the proffered reason "did not actually motivate Plaintiff's termination." *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502 (6th Cir. 2007). Conant's claims for religious discrimination focus almost entirely on Ferguson and Williams. While there are disputed facts indicating that Ferguson disagreed with elements of Conant's religious practices, and even poked fun at them, and that Williams reprimanded her for reasons related to her intermingling of religion and her official duties, Conant's theory of pretext contains gaping holes. Most significantly, it is undisputed that the county commissioners themselves made the decision to first suspend, and then terminate Conant, and Conant has produced no evidence whatsoever that either Ward, Evans, or Jordan harbored any animosity toward her based on her religious beliefs. While Conant makes much of the fact that the commissioners sometimes engaged in Christian prayer during Board meetings, rather than supporting her position, this fact tends to negate any inference of discrimination based on Conant's own openly expressed beliefs. Further, there is no evidence that Cannon and Iannotta, her superiors at the time of her termination, harbored ill-will toward her because of those beliefs.

As for Williams and Ferguson, it is also undisputed that Williams' employment with the county ended nearly two years before Conant was terminated and that Ferguson was her subordinate and not her supervisor. In response to these weaknesses with her pretext argument, and the fact that Williams was not the decision-maker with regard to Conant's thirty day suspension, Conant advances a so-called "cat's paw" theory of pretext. ""In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks

24

decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'"" *Roberts v. Principi*, 283 F. App'x 325, 333 (6th Cir. 2008) (quoting *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir. 2006)). With regard to Fergusson, Conant has produced no evidence to suggest that, other than providing information to Williams as part of the investigation that led to her suspension, Ferguson had any role whatsoever in determining whether Conant would be disciplined in either the context of her suspension or her termination. As for Williams, Conant's argument that he influenced the Board in disciplining Conant for improper motives fails to consider that Susan Brown's detailed report recommended that Conant be terminated. Conant has produced no evidence tending to show a discriminatory motive on the part of Brown.

Accordingly, summary judgment is appropriate because Conant has failed to produce evidence from which a reasonable jury could find that the stated reasons for the disciplinary action taken against her were merely pretexts for religious discrimination.

IV.

For the above-stated reasons, Defendants' Motion for Summary Judgment (Doc. 32) is **GRANTED**. The Clerk is directed to enter judgment in favor of Defendants and close this matter.

**IT IS SO ORDERED.**

|   |   |
|---|---|
| 9-19-11 |  |
| **DATED** | **EDMUND A. SARGUS, JR.**<br>**UNITED STATES DISTRICT JUDGE** |